MARGARET A. MOESER, Chief
Money Laundering, Narcotics and Forfeiture Section (MNF)
MARY BUTLER, Chief, International Unit
JONATHAN BAUM, Senior Trial Attorney
BARBARA Y. LEVY, Trial Attorney
JOSHUA L. SOHN, Trial Attorney (CBN: 250105)
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W. 10th Floor
  Washington, D.C. 20530
  Telephone:  (202) 353-9759
  Email:  barbara.levy@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>REAL PROPERTY LOCATED IN NEW YORK, NEW YORK, ALL FUNDS AND ASSETS ON DEPOSIT IN CHARLES SCHWAB BANK ACCOUNT NUMBERS '8106 AND '1384 TRACEABLE TO RENTAL PROCEEDS FROM THE REAL PROPERTY LOCATED IN NEW YORK, NEW YORK, AND ANY INCOME EARNED ON THOSE FUNDS AND ASSETS,<br><br>　　　　　Defendants. | No. CV<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br><br>[F.B.I.] |

The United States of America (the "Government") brings this complaint against the above-captioned assets and alleges as follows:

**PERSONS AND ENTITIES**

1. The plaintiff is the United States of America.

2. The defendants in this action are Real Property Located in New York, New York[1] (the "NYC CONDO"), All Funds and Assets On Deposit in Charles Schwab Bank Account Numbers '8106  ("SCHWAB ACCOUNT '8106") and '1384 ("SCHWAB ACCOUNT '1384") Traceable to Rental Proceeds From the NYC CONDO, And Any Income Earned On Those Funds and Assets (collectively, the "DEFENDANT ASSETS"), more particularly described in Attachments A and B.

3. The persons and entities known to the United States whose interests may be affected by this action are May Ling Catherine Tan ("C. TAN"), Ngook Yin Lim ("Lim"), Yong Shiang David Tan ("D. TAN"), 10MSW2G, LLC, the Board of Managers of 10 Madison Square West Condominium, and Bigwell Management Company Ltd.

4. Plaintiff has previously filed 44 related complaints seeking civil forfeiture of other assets, including the following (collectively, the "SUBJECT ASSETS"):

    a. Case number CV 16-5362 DSF (PLAx), *United States v. The Wolf of Wall Street Motion Picture, Including any Rights to Profits, Royalties and Distribution Proceeds owed to Red Granite Pictures, Inc. or its Affiliates and/or Assigns* (**"THE WOLF OF WALL STREET"**).

    b. Case number CV 16-5368 DSF (PLAx), *United States v. The Real Property Known as The Viceroy L'Ermitage Beverly Hills* (**"THE L'ERMITAGE PROPERTY"**).

    c. Case number CV 16-5369 DSF (PLAx) *United States v. All Business Assets of The Viceroy L'Ermitage Beverly Hills, Including All Chattels and Intangible Assets, Inventory, Equipment, and All Leases, Rents and Profits Derived Therefrom* (**"THE L'ERMITAGE BUSINESS ASSETS"**).

---

[1] Pursuant to L.R. 5.2-1, residential addresses are listed by the city and state only.

d.    Case number CV 16-5377 DSF (PLAx) *United States v. Real Property located in Beverly Hills, California* (**"HILLCREST PROPERTY 1"**).

e.    Case number CV 16-5378 DSF (PLAx) *United States v. Real Property located in Los Angeles, California* (**"ORIOLE MANSION"**).

f.    Case number CV 16-5379 DSF (PLAx) *United States v. Real Property located in Beverly Hills, California* (**"LAUREL BEVERLY HILLS MANSION"**).

g.    Case number CV 17-4438 DSF (PLAx) *United States v. Certain rights To and Interests In The Viceroy Hotel Group.* (**"THE VICEROY HOTEL GROUP ASSETS"**).

h.    Case number CV 17-4440 DSF (PLAx) *United States v. One Metropolis Poster* (**"METROPOLIS POSTER"**).

i.    Case number CV 20-8465 DSF (BFMx): *United States v. Forty-Nine Movie Posters in the Custody of Bonhams 1793 Limited in the United Kingdom* (**"BONHAMS MOVIE POSTERS"**).

j.    Case number CV 20-8466 DSF (BFMx): *United States v. All Funds Constituting Arbitration Award in* Petrosaudi v. PDVSA *UNCITRAL Arbitration* **("PETROSAUDI ARBITRATION AWARD").**

k.    Case Number CV 25-0474 DSF (BFMx): *United States v. The Sum of $20,000,000 in Funds and Securities Traceable Directly or Indirectly to UBS Account No. XX-XX718 WB and Fidelity Investment Account No. XXXXX7922, et al.,* **("SUM OF $20,000,000 IN FUNDS AND SECURITIES"**).

## NATURE OF THE ACTION

5.    This is a civil action *in rem* to forfeit assets involved in and traceable to an international conspiracy to, among other things, launder money misappropriated from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly-owned by the government of Malaysia.  The United States seeks forfeiture of property pursuant to 18 U.S.C. § 981(a)(1)(C), on the ground that it was

derived from violations of U.S. law, and pursuant to 18 U.S.C. § 981(a)(1)(A), on the ground that it is traceable to property involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957.

6.    1MDB was ostensibly created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on the issuance of various debt securities to fund these projects.  However, between approximately 2009 and at least 2014, multiple individuals, including public officials and their associates and various corporations, conspired to fraudulently divert billions of dollars from 1MDB through various means, including by defrauding 1MDB's Board of Directors and financial institutions, and sending or causing to be sent foreign wire communications in furtherance of the scheme, and thereafter, to launder the proceeds of that criminal conduct, including in and through U.S. financial institutions.  The funds diverted from 1MDB were used for, among other things, the personal use and benefit of the co-conspirators and their relatives and associates, including to purchase luxury real estate in the United States and overseas, acquire stock in United States companies, pay gambling expenses at Las Vegas casinos, acquire more than $200 million in artwork, purchase lavish gifts for family members and associates, invest in a major New York real estate development project, and fund the production of major Hollywood films.  1MDB maintained no interest in these assets and saw no returns on these investments.

7.    The criminal conduct involved in this scheme alleged in this Complaint occurred in at least four principal phases, only two of which are directly relevant to the DEFENDANT ASSETS in this case:

8.    The "Aabar-BVI" Phase:  In 2012, 1MDB officials and others misappropriated and fraudulently diverted a substantial portion of the proceeds that 1MDB raised through two separate bond offerings arranged and underwritten by Goldman Sachs International ("Goldman").  The bonds were guaranteed by both 1MDB and the International Petroleum Investment Company ("IPIC"), an investment fund wholly-owned by the government of Abu Dhabi, in the United Arab Emirates

("U.A.E.").  Beginning almost immediately after 1MDB received the proceeds of each of these two bond issues, 1MDB officials caused a substantial portion of the proceeds – approximately $1.367 billion, a sum equivalent to more than forty percent of the total net proceeds raised – to be wire transferred to a Swiss bank account belonging to a British Virgin Islands entity called Aabar Investments PJS Limited ("Aabar-BVI").

9.    Aabar-BVI was created and named to give the impression that it was associated with Aabar Investments PJS ("Aabar"), a subsidiary of IPIC incorporated in Abu Dhabi.  In reality, Aabar-BVI has no genuine affiliation with Aabar or IPIC, and the Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to siphon off proceeds of the 2012 bond sales for the personal benefit of officials at IPIC, Aabar, and 1MDB and their associates.  Funds diverted through the Aabar-BVI Swiss Account were transferred to, among other places, a Singapore bank account controlled by TAN Kim Loong, a/k/a Eric Tan ("TAN"), an associate of the lead 1MDB conspirator Low Taek Jho ("LOW").  Those funds were thereafter distributed for the personal benefit of various individuals, including officials at 1MDB, IPIC, or Aabar, rather than for the benefit of 1MDB, IPIC, or Aabar.  As set forth below, the DEFENDANT ASSETS are partly traceable to funds diverted through this phase.

10.    The "Tanore" Phase:  In 2013, several individuals, including 1MDB officials, diverted more than $1.26 billion out of a total of $3 billion in principal that 1MDB raised through a third bond offering arranged by Goldman in March 2013.  The proceeds of this bond offering were to be used by 1MDB to fund a joint venture with Aabar known as the Abu Dhabi Malaysia Investment Company ("ADMIC").  However, beginning days after the bond sale, a significant portion of the proceeds was instead diverted to a bank account in Singapore held by Tanore Finance Corporation ("Tanore Account"), for which TAN was the recorded beneficial owner.  Although the Tanore Account had no legitimate connection to 1MDB, the then-Executive Director of 1MDB, "Jasmine" LOO Ai Swan ("LOO"), was an authorized signatory on the account.  1MDB funds transferred into the Tanore Account were used for the personal benefit of LOW and his associates, including

officials at 1MDB, rather than for the benefit of 1MDB or ADMIC.  As set forth below, the DEFENDANT ASSETS are partly traceable to funds diverted through this phase.

11.    The proceeds of each of these phases of criminal conduct were laundered through a complex series of transactions, including through bank accounts in Singapore, Switzerland, Luxembourg, and the United States.  Use of the U.S. financial system was an essential feature of both the fraudulent diversion of 1MDB funds and of the subsequent movement of ill-gotten proceeds around the world.

## JURISDICTION AND VENUE

12.    This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

14.    Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California.

## BACKGROUND:  RELEVANT INDIVIDUALS AND ENTITIES

15.    **1Malaysia Development Berhad** ("**1MDB**") is a strategic investment and development company wholly-owned by the Malaysian government, through the Malaysian Ministry of Finance ("MOF").  It was formed in 2009 when the Malaysian government took control of a municipal entity called Terengganu Investment Authority ("TIA").[2]  1MDB's governance structure has been comprised of a senior leadership team, a Board of Directors ("1MDB Board of Directors" or "1MDB Board"), and a Board of Advisors.  Unless otherwise specified, references to 1MDB may include any of its wholly-owned subsidiaries.

---

[2] Except where a distinction is made, all references to 1MDB may refer to TIA before it was renamed 1MDB.

16. **International Petroleum Investment Company** ("**IPIC**") is an investment entity wholly-owned by the Abu Dhabi government. Its management is comprised of a Chairman, Deputy Chairman, Board of Directors, and Managing Director.

17. **Aabar Investments PJS** ("**Aabar**") is a public joint stock company incorporated under the laws of Abu Dhabi and a subsidiary of IPIC.

18. **Aabar Investments PJS Ltd.** is the name of at least two different entities created to mimic the IPIC subsidiary Aabar Investments PJS: (a) one incorporated in the British Virgin Islands in March 2012 by Khadem Abdulla Al-Qubaisi and Mohamed Ahmed Badawy Al-Husseiny ("Aabar-BVI"), and (b) one incorporated in the Seychelles in May 2014 by Mohamed Ahmed Badawy Al-Husseiny ("Aabar-Seychelles"). Aabar-BVI maintained a bank account at BSI Bank in Switzerland, and Aabar-Seychelles maintained a bank account at UBS AG in Singapore. IPIC and Aabar have clarified that neither entity is their affiliate.

19. **Abu Dhabi Malaysia Investment Company** ("**ADMIC**") is a purported 50:50 joint venture between 1MDB and Aabar that was created in or around March 2013 for the stated purpose of promoting the growth and development of Malaysia and Abu Dhabi. It was never capitalized.

20. **LOW Taek Jho, a/k/a/ Jho Low** ("**LOW**") is a Malaysian national who advised on the creation of TIA, 1MDB's predecessor beginning as early as 2009. LOW has never held a formal position at 1MDB, and he has publicly denied any involvement with 1MDB after its inception. LOW nevertheless exercised significant control over 1MDB during the time period relevant to this Complaint.

21. **1MDB OFFICER 1** is a Malaysian national who served as the Executive Director of 1MDB from the time of its creation until approximately March 2011. During this time, 1MDB OFFICER 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

22.     **1MDB OFFICER 2** is a Malaysian national who served as 1MDB's Chief Executive Officer ("CEO") between at least 2009 and 2013.  During this time, 1MDB OFFICER 2 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

23.     **"Jasmine" LOO Ai Swan ("LOO")** is a Malaysian national who served as 1MDB's General Counsel and Executive Director of Group Strategy during, at a minimum, 2012 and 2013.  LOO was a main point of contact between 1MDB and investment bank Goldman Sachs in connection with the three Goldman-underwritten bond offerings in 2012 and 2013.  During this time, LOO was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

24.     **1MDB OFFICER 4** is a Malaysian national who served as the Executive Director of Finance at 1MDB from, at a minimum, 2012 to 2015.  He worked on the Goldman bond deals and served as a main point of contact on two loans that Deutsche Bank arranged for 1MDB in 2014.  During this time, 1MDB OFFICER 4 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

25.     **1MDB-SRC OFFICER**, a Malaysian national, was the Chief Executive Officer and Director of SRC International Sdn. Bhd. ("SRC International") from late 2011 through 2013, at a minimum.  SRC International was a one-time subsidiary of 1MDB that was transferred to direct ownership by the Malaysian Ministry of Finance in 2012.  In 2011, prior to assuming his role at SRC International, the 1MDB-SRC OFFICER was the Chief Investment Officer of 1MDB.  During these time periods, the 1MDB-SRC OFFICER was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

26.     **MALAYSIAN OFFICIAL 1** is a high-ranking official in the Malaysian government who also held a position of authority with 1MDB.  During all times relevant

8

to the Complaint, MALAYSIAN OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

27. **"Eric" TAN Kim Loong ("TAN")** is a Malaysian national and an associate of LOW. He also served as a proxy for LOW in numerous financial transactions. He was the stated beneficial owner of several bank accounts into which misappropriated 1MDB funds were transferred.

28. **Khadem Abdulla Al-QUBAISI ("QUBAISI")**, a U.A.E. national, was the Managing Director of IPIC from 2007 to 2015 and the Chairman of Aabar in at least 2012 and 2013. During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code. QUBAISI also was a director of Aabar-BVI.

29. **Mohamed Ahmed Badawy Al-HUSSEINY ("HUSSEINY")**, a U.S. citizen, was the CEO of Aabar from 2010 to 2015. During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code. He was also a director of Aabar-BVI and Aabar-Seychelles.

30. **May Ling Catherine Tan ("C. TAN")**, a Singapore national and U.S. legal permanent resident, was LOW's close associate from approximately 2009. During this time, among other duties, she organized LOW's schedule, traveled with LOW, and provided concierge services including arranging travel, logistics, and correspondence with other co-conspirators on LOW's behalf.

## EVIDENCE SUPPORTING FORFEITURE

31. C. TAN acted as LOW's personal assistant and associate. Through a series of transactions detailed below, LOW provided C. TAN with funds misappropriated from 1MDB for support of and participation in the 1MDB misappropriation scheme. C. TAN

used a portion of those funds to invest in or purchase the Defendant Assets, including by using roughly $1.4 million to partially purchase the NYC CONDO and then depositing income from the NYC CONDO into the Defendant bank accounts.

32.     The DEFENDANT ASSETS represents a portion of the proceeds of the roughly $4.5 billion misappropriated from 1MDB.  The misappropriated funds, including the DEFENDANT ASSETS, funded the co-conspirators' lavish lifestyles, including purchases of artwork and jewelry, the acquisition of luxury real estate and luxury yachts, the payment of gambling expenses, and the hiring of musicians and celebrities to attend parties.  The use of the diverted 1MDB funds for the personal benefit of the co-conspirators and their associates was not consistent with the purposes for which 1MDB raised the funds, and neither 1MDB nor the government of Malaysia realized any returns on these purchases and expenditures.

# I.     BACKGROUND ON THE FORMATION OF 1MDB

33.     1MDB is an investment and development entity wholly-owned by the government of Malaysia, through the MOF.  It grew out of an entity called "Terengganu Investment Authority" ("TIA").  To raise capital for its operations, TIA issued and sold Islamic medium-term notes ("IMTNs"), a form of debt security, valued at 5 billion Malaysian ringgit (MYR).  By 2009 conversion rates, this amounted to approximately $1,425,680,000.  The IMTNs were 30-year notes with a yield of approximately 5.75 percent, issued with the assistance of AmBank in Malaysia.

34.     Electronic communications between Goldman employees and individuals involved with TIA confirm that LOW was involved in the creation of TIA.  For example, on or about January 14, 2009, 1MDB OFFICER 1, who served as TIA's Executive Director of Business Development and later became the Executive Director of 1MDB, sent an email to, among others, LOW and Goldman employees with the subject line "Re: Project TIARA."  In this email, 1MDB OFFICER 1 stated, referring to LOW: "I think it is best to get Jho involve[d] at every stage.  Jho will revert on the suitability of dates n [sic] time for the next 48 hrs."

35.     On or about March 31, 2009, LOW sent an email to a Goldman employee and 1MDB OFFICER 1 with the subject line "Re – Press Answer URGENT."  In the email, LOW stated:

> Bro, here is outline of the issues I would like to discuss with the Terengganu Investment Authority. In essence the disquiet surrounding the plan is that the fund will operate entirely on borrowed money, which is largely anathema because it puts taxpayer's money at risk. Could they elaborate on this concern?
>
> There is also the issue of transparency and will the money go towards portfolio investments or be used to buy strategic stakes in companies.? [sic]

36.     According to Malaysian news reports and archived 1MDB press releases, in or around July 2009, the Malaysian Ministry of Finance assumed control of TIA and the more than $1 billion in IMTNs issued by TIA.  In September 2009, TIA's name was changed to 1MDB.  The Malaysian government also became a guarantor on the IMTNs. 1MDB was to act as a strategic development company, wholly owned by the Malaysian government, with a mission to promote Malaysian economic development through global partnerships and foreign direct investment.  Pursuant to its governing documents, including its Articles of Association, the Malaysian government exercised a high degree of control over 1MDB.

37.     Upon its formation, MALAYSIAN OFFICIAL 1 assumed a position of authority with 1MDB.  MALAYSIAN OFFICIAL 1 had the authority to approve all appointments to, and removals from, 1MDB's Board of Directors and 1MDB's Senior Management Team.  In addition, any financial commitments by 1MDB, including investments, that were likely to affect a guarantee given by the government of Malaysia for the benefit of 1MDB or any policy of the Malaysian government, required the approval of MALAYSIAN OFFICIAL 1.

## II.    THE AABAR-BVI PHASE: APPROXIMATELY $1.367 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.    EXECUTIVE SUMMARY OF THE AABAR-BVI PHASE

38.    In 2012, approximately $1.367 billion in 1MDB funds that were raised in two separate bond offerings were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of two offering circulars that contained material misrepresentations and omissions relating to:

a.    How the proceeds of these bond issuances would be used,

b.    The nature of the relationship between the issuer (*i.e.*, subsidiaries of 1MDB) and IPIC, the bond's third-party guarantor, and

c.    The existence of any related-party transactions connected to the 2012 bond issuances, including that 1MDB officials, IPIC officials, and their associates would personally benefit from the issuance of these bonds.

39.    After more than $1 billion had been misappropriated from 1MDB between 2009 and 2011 in a prior phase of misappropriation, 1MDB needed to raise additional capital to fund its operations.  As set forth in greater detail below, 1MDB engaged Goldman to arrange and underwrite two separate bond offerings in 2012.  One of the stated purposes of the 2012 bond issues was to raise funds to allow 1MDB to acquire certain energy assets.

40.    IPIC guaranteed, either directly or indirectly, both 2012 bond offerings and, in exchange, a nominated subsidiary of IPIC was granted an option to purchase a minority share of the energy assets acquired by 1MDB.

41.    Almost immediately after receiving the proceeds of each of the 2012 bond issues, 1MDB wire transferred a substantial portion of the proceeds – totaling approximately $1.367 billion between the two bond sales, or more than forty percent of the net proceeds raised – to Aabar-BVI, an entity that bears a similar name to a

legitimate subsidiary of IPIC, named Aabar.  At the time of these transfers, QUBAISI was the Managing Director of IPIC and the Chairman of Aabar; and HUSSEINY was the CEO of Aabar.  QUBAISI and HUSSEINY were also directors of Aabar-BVI.

42.    QUBAISI and HUSSEINY opened the account at BSI Bank in Lugano in the name of Aabar-BVI (the "Aabar-BVI Swiss Account") and used the account to facilitate the diversion of funds from 1MDB.  LOW was also integrally involved in setting up the Aabar-BVI Swiss Account and in arranging for the fraudulent transfer of $1.367 billion from 1MDB to the Aabar-BVI Swiss Account.

43.    In their audited financial statements for the year ending on March 31, 2014, 1MDB booked their substantial payments to Aabar-BVI as an asset rather than a payment, describing it as a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds.

44.    In contrast, LOW and 1MDB officers represented to bank officials involved in the transfer of the $1.367 billion that the funds represented *non-refundable* payments to Aabar-BVI in consideration of IPIC's guarantee of the 2012 bonds.  The fact that $1.367 billion in proceeds of the 2012 bond sales was to be paid to Aabar-BVI was not disclosed in the bond offering circulars.

45.    Following the dismissal of QUBAISI and HUSSEINY from their positions at IPIC and Aabar in 2015, IPIC and Aabar clarified that Aabar-BVI is not owned by either entity.

46.    The Aabar-BVI Swiss Account was used to siphon off proceeds of the two 2012 bond sales for the personal benefit of individuals affiliated with IPIC, Aabar, and 1MDB, as well as their associates.  Beginning within days of receiving funds from 1MDB, Aabar-BVI transferred a total of approximately $636 million to the Singapore bank account held by Blackstone Asia Real Estate Partners (the "Blackstone Account").  During this same time period, Aabar-BVI transferred, through multiple overseas investment funds, an additional approximately $465 million to the Blackstone Account.

The beneficial owner of the Blackstone Account was identified in bank records as TAN, a Malaysian national and an associate of LOW.

47.    Funds transferred to the Blackstone Account by Aabar-BVI were subsequently distributed to officials of IPIC, Aabar, and 1MDB.  Between approximately May and November 2012, shortly after Blackstone's receipt of funds from the Aabar-BVI Swiss Account, Blackstone transferred $472,750,000 into a Luxembourg account beneficially owned by QUBAISI.  During roughly the same time period, Blackstone transferred $66.6 million into two different accounts beneficially owned by HUSSEINY. In October and November 2012, Blackstone transferred $30 million to an account belonging to MALAYSIAN OFFICIAL 1.  Finally in December 2012, Blackstone transferred $5 million to a Swiss account beneficially owned by LOO, who was then 1MDB's General Counsel and Executive Director of Group Strategy.

Shortly after receiving proceeds of the two 2012 bond sales from 1MDB, Aabar-BVI also transferred $238 million to a Singapore bank account belonging to Red Granite Capital, an entity owned by Riza Shahriz Bin Abdul AZIZ ("AZIZ").  AZIZ is a relative of MALAYSIAN OFFICIAL 1 and a friend of LOW.  Among other things, AZIZ used these funds to purchase luxury real estate in the United States and the United Kingdom for his personal benefit, and to fund his movie production company, Red Granite Pictures.  1MDB has disclaimed any investment interest in Red Granite Pictures.

49.    As set forth in Section IV. below, part of the purchase funds for the NYC CONDO are traceable to funds diverted through this phase of the criminal scheme.

**B.    IN OCTOBER 2012, 1MDB ISSUED $1.7 BILLION IN BONDS IN AN OFFERING ARRANGED BY GOLDMAN**

50.    As mentioned above, in 2012, 1MDB issued $3.5 billion in bonds in two separate offerings arranged by Goldman.  The second of these offerings, issued in October 2012, is described below.

51.    At least as early as June 2012, 1MDB sought financial advice from Goldman in connection with its anticipated acquisition of power assets from Genting

Berhad, a Malaysian entity, and sought Goldman's assistance in raising an additional tranche of capital to acquire those assets. As with the bond deal that closed in May 2012, known within Goldman as "Project Magnolia," 1MDB elected to have this second bond issue fully underwritten by Goldman for an additional fee. Within Goldman, this private placement bond transaction was referred to by the name "Project Maximus."

52.     LOO served as the primary point of contact between 1MDB and Goldman concerning the Project Maximus transaction.

53.     1MDB entered into an agreement to purchase power assets from Genting Berhad ("Genting") on or about August 13, 2012. That same day, 1MDB created another wholly-owned subsidiary called "1MDB Energy (Langat) Limited" ("1MDB Energy Langat"), for the purposes of holding the power assets and issuing debt securities to fund the acquisition Genting power assets.

54.     The offering circular for Project Maximus, dated October 17, 2012, indicated that 1MDB issued $1.75 billion in bonds through its second private placement with Goldman, with a closing date of October 19, 2012. The notes had an interest rate of 5.75% per annum and were redeemable in 2022. The net proceeds of the bond sale – once Goldman's fees, commissions, and expenses were deducted – were listed in the offering circular as approximately $1,636,260,000.

55.     The offering circular represented that the net proceeds of the Project Maximus bond sale were to be used by 1MDB Energy Langat, in part, to satisfy its obligations under its agreement to acquire power assets from Genting Berhad. Specifically, the offering circular represents that 1MDB Energy Langat intended to use approximately $692,357,349 of the approximately $1,636,260,000 in net proceeds for the purpose of the Genting acquisition, and it intended to use the balance of the proceeds "for general corporate purposes (which may include future acquisitions)."

56.     In truth, however, as explained below, $790,354,855 – a sum equivalent to roughly half of the net proceeds of the Project Maximus bond offering – was diverted to Aabar-BVI on or about the same day that 1MDB received the proceeds of this bond sale.

As with Project Magnolia, the offering circular for Project Maximus nowhere disclosed that nearly half of the net bond proceeds would be transferred to Aabar-BVI, in the form of "collateral" or otherwise, or that funds transferred to Aabar-BVI would subsequently be used for the personal benefit of officials at IPIC, Aabar, and 1MDB, including QUBAISI and HUSSEINY.

57.     1MDB guaranteed the notes issued by 1MDB Energy Langat.  Although IPIC did not directly guarantee the Project Maximus notes, it nevertheless agreed to privately secure the bonds on a bilateral basis with Goldman.  No reference to IPIC's indirect guarantee was included in the offering circular.  The consideration given for that guarantee was set forth in an October 17, 2012, agreement entitled "Collaboration Agreement (Option)," entered into between 1MDB Energy Langat and "Aabar Investments PJS, a joint stock company organized under the laws of Abu Dhabi."  That agreement stated that, "[i]n consideration of Aabar Investments procuring the Guarantee from IPIC and the sum of United States Dollar One (USD1.00) paid by Aabar Investments to [1MDB]," 1MDB granted Aabar the option to acquire a forty-nine percent (49%) interest in 1MDB Energy Langat within a ten year period.  The existence of this "1MDB Energy Option Agreement" was disclosed in the offering circular.

58.     Taken together, in 2012, 1MDB issued $3.5 billion in bonds that were underwritten by Goldman and guaranteed by IPIC.

## C.     A SUBSTANTIAL PORTION OF THE PROCEEDS OF THE 2012 BOND SALES WAS DIVERTED TO AND THROUGH THE AABAR-BVI SWISS ACCOUNT

59.     Over the course of several months, a large portion of the proceeds of both the 2012 bond sales – approximately $1.367 billion in total – was transferred from 1MDB to a bank account at BSI Bank in Switzerland held in the name of Aabar-BVI. Plaintiff alleges on information and belief that the funds transferred to the Aabar-BVI Swiss Account by 1MDB were not held for the benefit of 1MDB, IPIC, or Aabar. Rather, the Aabar-BVI Swiss Account was used to unlawfully divert proceeds of both

the Project Magnolia and Project Maximus bonds, which were thereafter used, after having passed through various accounts, to make substantial payments, including to QUBAISI, HUSSEINY, MALAYSIAN OFFICIAL 1, and LOO.

> 1.    *On or about May 22, 2012, Within Roughly One Day of the First Bond Issue, Approximately $577 Million in 1MDB Funds Was Diverted to the Aabar-BVI Swiss Account*

60.    The closing date for the Project Magnolia bonds was on or about May 21, 2012.  Documentation associated with the bond deal shows that a total of $650,000,000 was to be deducted from the proceeds and remitted directly to accounts designated by Tanjong Power, the entity from which 1MDB Energy had agreed to purchase Tanjong Energy.

61.    On or about May 21, 2012, a total of $907,500,000 in proceeds from the bond sale was transferred, at the direction of Bank of New York–London, from an account at Bank of New York Mellon–New York in the United States to an account at Falcon Private Bank Limited ("Falcon Bank") held by 1MDB Energy.

62.    Roughly one day later, on or about May 22, 2012, a wire in the amount of $576,943,490 was sent from 1MDB Energy's bank account at Falcon Bank to an account at BSI Bank in Lugano, Switzerland maintained by Aabar-BVI (the "Aabar-BVI Swiss Account").  This amount represents more than one third of the net proceeds from the Project Magnolia bond sale.  The funds passed through correspondent bank accounts at J.P. Morgan Chase and Citibank in the United States before being transferred to Aabar-BVI.  This was the first credit to the Aabar-BVI Swiss Account.

63.    Nothing in the Project Magnolia offering circular disclosed that any funds would be sent to Aabar-BVI, let alone one third of the net bond proceeds.

64.    Falcon Bank is wholly-owned by Aabar, and at the time that the $576,943,490 was transferred from 1MDB Energy's bank account at Falcon Bank to the Aabar-BVI Swiss Account, HUSSEINY was Falcon Bank's Chairman.

> 2.    *On or about October 19, 2012, Roughly the Same Day as the Second*

17

*Bond Issue, Approximately $790 Million in 1MDB Funds Was*
*Diverted to the Aabar-BVI Swiss Account*

65.    The proceeds from the Project Maximus bonds, which were issued on or about October 19, 2012, were transferred according to a similar pattern.

66.    1MDB directed that payment of the proceeds of the Project Maximus bond sale, totaling $1,640,000,000, be made on October 19, 2012, to 1MDB Energy Langat's account at Falcon Bank, via Falcon Bank's U.S. correspondent bank account at J.P. Morgan Chase.

67.    On or about that same day (that is, October 19, 2012), 1MDB wire transferred $790,354,855 from the 1MDB Energy Langat account at Falcon Bank to the Aabar-BVI Swiss Account.  This sum represents close to fifty percent (50%) of the net proceeds of the Project Maximus bond sale.  The funds passed through correspondent bank accounts at J.P. Morgan Chase and Citibank in the United States before being transferred to Aabar-BVI.

68.    Nothing in the Project Maximus offering circular disclosed that any portion of the funds, let alone close to fifty percent of the net proceeds of the bond sale, would be funneled to Aabar-BVI in the form of "collateral" or otherwise.

69.    Collectively, between the two 2012 bond sales, officials at 1MDB transferred approximately $1.367 billion in bond proceeds to the Aabar-BVI Swiss Account.  This represented more than forty percent (40%) of the total net proceeds of the two bond sales.

3.    *The Aabar-BVI Account Was Used to Siphon Off Funds from 1MDB*

70.    The Aabar-BVI Swiss Account was used by HUSSEINY, QUBAISI, and LOW (among others) to fraudulently siphon off a portion of the 2012 bond proceeds.

71.    BSI Bank in Singapore was approached about the opening of an account for Aabar-BVI in approximately March 2012, at or around the same time that 1MDB officials were in communication with Goldman employees about the bond issuance. LOW was a driving force behind the opening of the Aabar-BVI Swiss Account.  Among

18

other things, LOW represented to BSI employees that the account would be funded with significant payments from 1MDB, in accordance with an agreement between 1MDB and IPIC that had been approved by Goldman.

72.    Upon information and belief, LOW met with SINGAPORE BANKER 1 in Los Angeles in late March 2012 to discuss the opening of the Aabar-BVI Swiss Account.  Email records show that SINGAPORE BANKER 1 traveled to Los Angeles at LOW's invitation during this time period.  On or about March 23, 2012, SINGAPORE BANKER 1 sent an email to other employees of BSI Bank in Singapore, with the subject line "IPIC/Aabar partnership with 1MDB/1MEL – Tanjong Energy."  This email was sent to BSI employees, including compliance employees, to explain that the Aabar-BVI Swiss Account would be capitalized with funds from 1MDB.  The email explained that IPIC had agreed to guarantee $1.75 billion in funds raised by 1MDB and in exchange, 1MDB had agreed to provide Aabar with (1) options to acquire 49% interest in the Tanjong energy asset, and (2) "a contribution payment of USD$517.5m payable by 1MEL to Aabar Investments PJS Limited."  This payment was purportedly to "justify the risk taken by Aabar's delivery of IPIC's guarantee."

73.    Travel records show that at the time this email was sent, SINGAPORE BANKER 1 was in Los Angeles.  Hotel records also show that, on the day the email was sent, SINGAPORE BANKER 1 and LOW were both at the L'Ermitage Hotel in Beverly Hills.  Upon information and belief, LOW provided SINGAPORE BANKER 1 with the transaction details contained in the email.

74.    1MDB OFFICER 4 was also involved in helping set up the Aabar-BVI Swiss Account.  He was aware of both the plan for 1MDB to transfer hundreds of millions of dollars in bond proceeds to Aabar-BVI immediately after the bond closing dates as well as the contents of the offering circulars, which did not disclose those planned payments.

75.    The process of opening the Aabar-BVI Swiss Account took several weeks. During this period, BSI bank officials who were responsible for assuring the bank's

compliance with applicable anti-money laundering and other applicable laws (sometimes referred to as the "compliance" process) asked questions about the nature of Aabar-BVI, the purpose of the account, and the business justification for the anticipated capitalization of the account with sizeable payments from 1MDB.

76.     The Aabar-BVI Swiss Account was opened on or about April 9, 2012. Although Aabar-BVI's account was booked in Lugano, Switzerland, bankers in the Singapore branch of BSI, including SINGAPORE BANKER 1, managed the bank's relationship with Aabar-BVI.  Accordingly, compliance officials in both the Lugano and Singapore offices of BSI were involved in reviewing transactions into and out of the Aabar-BVI Swiss Account.

77.     Shortly before the transfer of approximately $577 million from 1MDB to the Aabar-BVI Swiss Account (which, as noted above, took place on or about May 22, 2012), BSI was given a copy of an agreement between Aabar-BVI and 1MDB Energy Limited entitled "Collaboration Agreement for Credit Enhancement" (hereinafter, "Contribution Agreement").  The agreement bears the signature of 1MDB OFFICER 2 and HUSSEINY, and is dated May 21, 2012, the same day as the closing date for the bond sale.  This agreement was provided to BSI as part of the compliance process, to bolster the legitimacy of the incoming $577 million transfer from 1MDB.

78.     The Contribution Agreement provided to BSI was similar in appearance to the Option Agreement that was provided to Goldman and that was referenced in the offering circular for Project Magnolia.  Like the Options Agreement, the Contribution Agreement purported to set forth the consideration given by 1MDB in exchange for IPIC's guarantee of the Project Magnolia bond notes.  And like the Option Agreement, the Contribution Agreement provided that Aabar-BVI would receive an option to acquire a 49% interest in the power assets that 1MDB had contracted to purchase.  Unlike the Option Agreement, however, the Contribution Agreement also provided that 1MDB would pay Aabar-BVI a "credit enhancement and underwriting contribution in cash," within three days of 1MDB's receipt of the bond proceeds.  Calculation of this

contribution fee was to be "based on the present value amount (utilising the 1MEL Notes annual coupon rate as the discount rate for purposes of the present value calculation) of 2.80% annual interest rate payable per annum of the Total Guaranteed Amount for the total tenure of ten (10) years."  The Contribution Agreement further provided that Aabar-BVI was "unconditionally entitled to deal with [the cash contribution from 1MDB] as it deems fit."  The agreement provided that payment would be made to the Aabar-BVI Swiss Account.

79.     Alongside the Contribution Agreement, BSI Bank was also provided with a set of "payment calculations" which purported to show that, pursuant to the Contribution Agreement, "a total sum of USD576,943,490 in full is due from 1MEL to Aabar in consideration of the credit enhancement."  These payment calculations were sent to SINGAPORE BANKER 1 by one of the co-conspirators and thereafter forwarded to others at BSI Bank in Singapore, including compliance officials.

80.     In crediting the Aabar-BVI Swiss Account with approximately $577 million from 1MDB, BSI Bank relied on representations that the funds were a legitimate payment to a subsidiary of IPIC pursuant to the Contribution Agreement.  BSI also relied on representations that this fee arrangement had been created with the input and assent of Goldman.

81.     BSI was provided with a nearly-identical "Collaboration Agreement for Credit Enhancement" in order to justify Aabar-BVI's receipt of approximately $790 million in proceeds from the Project Maximus bond notes ("Maximus Contribution Agreement").  That agreement was dated October 19, 2012 – the same day the bond deal closed – and stated that 1MDB would give Aabar-BVI both an option to acquire power assets as well as a "credit enhancement and underwriting contribution in cash."  Payment calculations in the bank's records show that the bank understood that the "contribution in cash" due to Aabar-BVI under this agreement was $790,354,855.  As with the prior agreement submitted to BSI Bank, the Maximus Contribution Agreement provided that

Aabar-BVI was "unconditionally entitled to deal with" the cash contribution "as it deems fit." The agreement bore the signature of HUSSEINY and 1MDB OFFICER 2.

82. Neither of the offering circulars contain any mention of an agreement by 1MDB to pay Aabar-BVI, either as a premium or as collateral, more than forty percent (40%) of the net proceeds from the two 2012 bond sales in order to secure the guarantees. This information would have been material to the transactions, because it would have significantly affected 1MDB's liquidity, as well as its ability to engage successfully in the business ventures described in the offering circulars, and thereby increased the risk of default.

83. In its audited financial statements for the year ending on March 31, 2014, 1MDB booked their payment of $1.367 billion to Aabar-BVI as an asset rather than a liability, claiming that it represented a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds. This characterization is inconsistent with the terms of the two Contribution Agreements that were provided to BSI to justify the payments. As noted above, those agreements gave Aabar-BVI discretion to dispose of the "cash contributions" from 1MDB as it pleased. Upon information and belief, 1MDB OFFICER 4 convinced the auditor to sign off on the characterization of these payments to Aabar-BVI as a "refundable deposit" by, among other things, soliciting HUSSEINY to provide the auditor with written confirmation, dated February 25, 2014, that the sum represented a "balance receivable" owed to 1MDB.

84. The Malaysian Public Accounts Committee ("PAC") initiated an audit of certain 1MDB financial transactions and produced a public report of its findings. Auditors working at the direction of the PAC concluded that the $1.367 billion in supposed "security deposit" payments made to Aabar-BVI in 2012 were "made without the approval of the 1MDB Board of Directors."

1

           *4.    Funds Transferred to the Aabar-BVI Swiss Account Were Not Held*

2

                       *for the Benefit of 1MDB, IPIC, or Aabar*

3        85.    At the time the Aabar-BVI Swiss Account was opened, QUBAISI and

4  HUSSEINY falsely represented to Swiss and Singapore bankers at BSI that Aabar was

5  the beneficial owner of the Aabar-BVI Swiss Account.  On the "Form A," which is the

6  official declaration of beneficial ownership, dated April 9, 2012, QUBAISI and

7  HUSSEINY both attested under penalty of criminal prosecution for forgery under Swiss

8  law that Aabar was the sole beneficial owner of the assets deposited in the Aabar-BVI

9  Swiss Account.

10      86.    Aabar Investments PJS Limited (referred to herein as "Aabar-BVI") is an

11  entity incorporated in the British Virgin Islands ("BVI") and is separate and distinct from

12  the similarly-named Aabar Investments PJS (referred to herein as "Aabar"), which is

13  controlled by IPIC and is incorporated in Abu Dhabi.

14      87.    A Certificate of Incumbency prepared by Aabar-BVI's registered agent in

15  the BVI indicates that Aabar-BVI was incorporated in BVI on March 14, 2012.  That

16  certificate lists QUBAISI and HUSSEINY as Aabar-BVI's Directors and "Aabar

17  Investments PJS" as its sole shareholder.

18      88.    It is possible, however, to register an entity with a name that mimics the

19  name of an existing entity, without the need to prove any relationship to the existing

20  entity.  This is a common technique to lend the entity in question an appearance of

21  legitimacy.  It is also possible to incorporate an entity in the BVI without providing

22  evidence of the entity's true beneficial ownership and without providing evidence of the

23  relationship between the entity and the shareholder listed in the incorporation records.

24      89.    Irrespective of any apparent nominal relationship between Aabar-BVI and

25  Aabar reflected in incorporation records, Aabar-BVI was not a legitimate subsidiary of

26  Aabar or IPIC operating within the bounds of any authority granted by Aabar or IPIC,

27  and the funds transmitted from 1MDB to the Aabar-BVI Swiss Account were not held in

28  that account for the benefit of 1MDB, IPIC, or Aabar.

90.     On or about April 11, 2016, IPIC and Aabar issued a statement to the London Stock Exchange in response to media reports indicating that a BVI entity called Aabar Investments PJS Limited had received substantial payments from 1MDB.  In that statement, IPIC and Aabar stated that, "Aabar BVI was not an entity within either corporate group" and that neither IPIC nor Aabar "has received any payments from Aabar BVI. . . ."

91.     In response to IPIC's statement to the London Stock Exchange, 1MDB issued a press release on April 11, 2016, in which 1MDB indicated that it paid Aabar-BVI "substantial sums" in 2012, as recorded in its financial statements.  That same release also asserted that, "1MDB company records show documentary evidence of the ownership of Aabar BVI and of each payment made, pursuant to various legal agreements that were negotiated with Khadem Al Qubaisi in his capacity as Managing Director of IPIC & Chairman of Aabar and/or with Mohamed Badawy Al Husseiny, in his capacity as CEO of Aabar."

92.     QUBAISI and HUSSEINY were dismissed from their positions at IPIC and Aabar in 2015.

93.     In June 2016, IPIC filed its consolidated financial statements for the year ending December 31, 2015, with the London Stock Exchange.  In those financial statements, IPIC indicated that it "understands that other companies outside the group's corporate structure were incorporated in other offshore jurisdictions using variations of the 'Aabar' name.  The Group is investigating these entities further."  IPIC reiterated that neither it nor Aabar were affiliated with, or received payments from, Aabar-BVI. Finally, IPIC indicated that after 1MDB defaulted on two interest payments due under the 2012 notes in the first half of 2016, IPIC made interest payments totaling $103 million on 1MDB's behalf "pursuant to its obligations in respect of the Guarantees."

94.     Bank statements for the Aabar-BVI Swiss Account show no activity consistent with the operation of a legitimate subsidiary of IPIC.  Rather, they show that, other than temporary fiduciary deposits, the account was used in 2012 solely to collect

and distribute 1MDB bond proceeds.  Funds transferred from 1MDB to the Aabar-BVI Swiss Account were subsequently distributed, inter alia, to officials at IPIC, Aabar, and 1MDB, including QUBAISI and HUSSEINY, with several payments occurring within days of the receipt of 1MDB funds by Aabar-BVI.  As set forth below in Section IV., some of these funds were ultimately used by C.TAN to acquire the DEFENDANT ASSETS.  Plaintiff alleges on information and belief that the Aabar-BVI Swiss Account was used to conceal and to facilitate this unlawful diversion of funds.

## III.  THE TANORE PHASE:  MORE THAN $1.26 BILLION IS MISAPPROPRIATED FROM 1MDB

### A.  EXECUTIVE SUMMARY OF THE TANORE PHASE

95.  In 2013, more than $1.26 billion in 1MDB funds that were raised in a third bond offering arranged by Goldman were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of an offering circular that again contained material misrepresentations and omitted material facts necessary to render its representations not misleading regarding:

- How the proceeds of these bond issuances would be used, and
- The existence of any related-party transactions connected to the 2013 bond issuances, including that 1MDB officials and their associates and relatives would personally benefit from the issuance of these bonds.

96.  1MDB issued an additional $3 billion in Goldman-underwritten bonds in March 2013.  Notwithstanding the fact that the stated purpose of these bonds was to generate proceeds to invest in the ADMIC joint venture with Aabar to promote the growth and development of Malaysia and Abu Dhabi, more than $1.26 billion in proceeds was diverted to a bank account held in the name of Tanore Finance Corporation (the "Tanore Account").  As with the Blackstone Account, TAN was the beneficial owner of record for the Tanore Account.  Although the account had no legitimate

affiliation with 1MDB or ADMIC, LOO was an authorized signatory on the Tanore Account.

97.    Funds transferred to the Tanore Account were distributed for the benefit of at least one public official associated with 1MDB.  More particularly, very shortly after the bond offering closed, between approximately March 21, 2013 and March 25, 2013, $681 million was transferred from the Tanore Account to an account belonging to MALAYSIAN OFFICIAL 1.  Of this amount, approximately $620 million was returned to the Tanore Account on or about August 26, 2013.

98.    1MDB funds diverted to the Tanore Account were also used by LOW and TAN to purchase artwork for their personal benefit and to purchase an interest in the Park Lane Hotel in New York City for the personal benefit of LOW.  The disposition of these funds was not consistent with the intended use of the 2013 bond proceeds nor was it made for the benefit of 1MDB or ADMIC.

99.    As set forth in Section IV. below, part of the purchase funds for the NYC CONDO are traceable to funds diverted through this phase of the criminal scheme.

## B.    IN MARCH 2013, 1MDB ISSUED $3 BILLION IN GOLDMAN-UNDERWRITTEN BONDS FOR INVESTMENT IN A JOINT VENTURE WITH AABAR

100.    According to the ADMIC joint venture agreement (the "ADMIC Agreement"), the formation of ADMIC was "of strategic importance to the government-to-government relationship between the Government of the Emirate of Abu Dhabi and the Government of Malaysia, given the strategic initiatives to be undertaken jointly by the Parties and the catalytic effect such initiatives are expected to have upon the growth and development of Malaysia and the Emirate of Abu Dhabi respectively."[3]

---

[3] ADMIC is an entity distinct from the Abu Dhabi Malaysia Kuwait Investment Corporation ("ADKMIC").  The former was a purported joint venture between 1MDB and Aabar in which the proceeds of the Project Catalyze bond were supposed to be invested, whereas the latter was an entity owned and controlled by LOW that was used to launder funds.

101.    Pursuant to the ADMIC Agreement, ADMIC was to be capitalized by an investment of $3 billion by 1MDB and $3 billion by Aabar.  1MDB and Aabar, as the two shareholders of the company, were to adopt an investment plan for ADMIC, to include a "five (5) year strategic roadmap for the investment policies of the Company," as soon as practicable after formation of the company.

102.    The ADMIC Agreement provides that "the Company [*i.e.*, ADMIC] will open and maintain bank accounts in the name of [ADMIC]."  It further provides that "[a]ll monies of [ADMIC], and all instruments for the payment of money to [ADMIC], shall be deposited in the bank accounts of [ADMIC]."

103.    The joint venture agreement was signed by QUBAISI, as the Chairman of Aabar, and by the Chairman of 1MDB's Board of Directors; and it was witnessed by HUSSEINY, the CEO of Aabar, and by 1MDB OFFICER 2, the CEO of 1MDB.  Aabar appointed QUBAISI as a director of ADMIC and 1MDB appointed its Chief Financial Officer.

104.    At least as early as mid-January 2013, officials at 1MDB enlisted Goldman's assistance to finance its capital contribution to the planned joint venture through privately placed debt securities.  LOO served as a main point of contact between 1MDB and Goldman on this deal.  Within Goldman, this bond transaction was referred to by the name "Project Catalyze."

105.    In a March 2013 presentation prepared for 1MDB, IPIC, and Aabar in connection with the deal, Goldman set forth its understanding of 1MDB's "key objectives."  Foremost among these were "maintenance of confidentiality during execution" of the deal and "speed of execution."

106.    1MDB issued approximately $3 billion in bonds through its third private placement with Goldman.  The closing date for the bond issue was March 19, 2013.  The notes had a 4.4% interest rate and were redeemable in 2023.  The offering circular, dated March 16, 2013, listed the net proceeds of the bond sale, once Goldman's fees, commissions, and expenses were deducted, as approximately $2,716,760,000.  The

bonds were issued by 1MDB Global Investments Limited ("1MDB Global"), a wholly owned subsidiary of 1MDB that was incorporated in the British Virgin Islands on March 8, 2013.

107.   The Government of Malaysia provided a "Letter of Support," dated March 14, 2013, in connection with the Project Catalyze transaction.  That Letter of Support provided, among other things, that if 1MDB failed to provide adequate capital to ensure that 1MDB Global was able to service its obligations with respect to the bonds, Malaysia would then "step-in to inject the necessary capital into the Issuer or make payments to ensure the Issuer's obligation in respect of the Debt are fully met."  The Letter of Support also indicated that, "[t]o the fullest extent permitted by law," Malaysia would waive its sovereign immunity and submit itself to the jurisdiction of English courts in connection with disputes arising out of the letter.  The letter is signed by MALAYSIAN OFFICIAL 1.

108.   The offering circular represents that 1MDB Global intended to "either on-lend all of the net proceeds of this Offering to ADMIC or use the net proceeds of the offering to fund its investment in ADMIC, which will be a 50:50 joint venture between the Issuer and Aabar."  The offering circular noted that "ADMIC has yet to adopt a formal investment plan or establish investment criteria."  It further represented that "ADMIC does not have any specific investment, merger, stock exchange, asset acquisition, reorganization, or other business combination under consideration or contemplation and ADMIC has not, nor has anyone on ADMIC's behalf, contacted, or been contacted by, any potential target investment or had any discussions, formal or otherwise, with respect to such a transaction."  The circular goes on to note that, "The Board of Directors intends to adopt an investment plan as soon as is practicable.  The investment plan, and any future investments, will be made with the mutual agreement of the shareholders of ADMIC," *i.e.*, Aabar and 1MDB.

109.   In a press release issued on April 23, 2013, 1MDB indicated that, "[t]he proceeds from the US$3 billion capital raised will be utilised for investments in strategic

and important high-impact projects like energy and strategic real estate which are vital to the long term-economic [sic] growth of both countries." The press release gave, as an example of a future investment project, the Tun Razak Exchange (TRX).

110. In truth, however, as set forth below, instead of being used to fund ADMIC, more than $1.26 billion in bond proceeds from the 2013 bond offering were diverted to unrelated overseas shell company accounts, including at Falcon Bank.

111. The offering circular also omitted material facts necessary to make its representations regarding the use of the bond proceeds not misleading, in that it failed to disclose that certain individuals related to 1MDB, including MALAYSIAN OFFICIAL 1, would receive hundreds of millions of dollars from the proceeds of the bond sale within days of its closing. This fact would have been material to the bond transaction, as it would have alerted investors to the possibility of conflicts of interest and related-party transactions. The representation that ADMIC had not determined how all of the bond proceeds would be used did not encompass using those funds, beginning almost immediately after the bond issue, for the personal benefit of individuals related to 1MDB and their associates.

## C. FUNDS FROM THE 2013 BOND SALE WERE DIVERTED TO THE TANORE ACCOUNT

112. Notwithstanding the fact that 1MDB represented in the offering circular and its press release that the proceeds of the 2013 bond sale would be used to fund ADMIC, more than $1.26 billion was diverted from the proceeds of the 2013 bond sale through bank accounts controlled by TAN and held in the name of various entities, including Tanore Finance Corporation and Granton Property Holdings. This approximately $1.26 billion in funds was neither lent to ADMIC nor used to fund 1MDB's investment in ADMIC, as represented in the bond offering circular, but instead was held and used for the benefit of LOW and his associates, including public officials of 1MDB.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        *1.    The Movement of Funds Through the Overseas Investment Funds*

      113.   On or about March 19, 2013, a total of $2.721 billion, representing proceeds of the Project Catalyze bond sale, was transferred from Bank of New York Mellon into the BSI Lugano account of 1MDB Global in two separate wires of $2,494,250,000 and $226,750,000.  The payments details listed in both SWIFT messages indicate, in relevant part: "ATTN [SINGAPORE BANKER 1.]"  SINGAPORE BANKER 1 is the same individual whose name appears in corporate records involved in other aspects of the scheme.  At the time of the wire transfers to 1MDB Global, SINGAPORE BANKER 1 was employed by BSI Bank in Singapore.

      114.   Between May 21 and 27, 2013, 1MDB Global transferred a total of $1.590 billion from its account at BSI Lugano to accounts belonging to three different overseas investment funds:  Devonshire Capital Growth Fund ("Devonshire"), a fund located in the British Virgin Islands; Enterprise, a fund located in Curacao; and Cistenique, another fund located in Curacao (collectively, the "Overseas Investment Funds" or "Funds").  This money was routed via the clearing company Citco, before being transferred into the accounts of the Overseas Investment Funds.  Two of these three funds, Cistenique and Enterprise, were used in 2012 to pass funds traceable to the Project Maximus bond proceeds from Aabar-BVI to Blackstone.

      115.   The approximate dates and aggregated amounts of these transfers from 1MDB Global to the three Overseas Investments Funds, via Citco, are set forth below:

**Table 1:  Wire Transfers from 1MDB Global to Overseas Investment Funds**

| Dates | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 3/21/2013 | 1MDB Global | Devonshire | $646,464,649 |
| 3/21/13 - 3/27/2013 | 1MDB Global | Enterprise | $414,756,416 |
| 3/21/13 - 3/22/2013 | 1MDB Global | Cistenique | $531,090,534 |

      116.   Within approximately two days after 1MDB Global began its transfer of more than $1.5 billion to the Overseas Investment Funds, the Overseas Investment Funds

collectively transferred a total of $835 million to the Tanore Account.  The approximate dates and amounts of these wires, which passed through a correspondent bank account at J.P. Morgan Chase in the United States, are summarized below:

**Table 2: Wire Transfers from Overseas Investment Funds to Tanore**

| Date | Sending Party | Sending Party Bank | Receiving Party | Amount |
|------|---------------|--------------------|--------------------|--------|
| 3/21/2013 | Devonshire | BSI Bank - Singapore | Tanore | $210,000,000 |
| 3/22/2013 | Enterprise | ING Bank - Netherlands | Tanore | $250,000,000 |
| 3/22/2013 | Cistenique | ING Bank Netherlands | Tanore | $375,000,000 |

117.   TAN opened the Tanore Account on or about November 2, 2012, and he was originally its sole authorized signatory.  Bank records list HUSSEINY, who was Chairman of Falcon Bank, as the "referrer" for the account.  TAN functioned as a proxy for LOW with respect to the Tanore Account, and LOW routinely communicated with bankers about the Tanore Account using TAN's email account.

118.   On or about March 20, 2013, one day before funds were first credited to the Tanore Account from the Overseas Investment Funds, LOO was given signing authority on the Tanore Account through the execution of a Power of Attorney form signed by LOO.  A copy of the Malaysian passport belonging to LOO was included in that documentation.  LOW was responsible for adding LOO as an authorized signatory to the account.

119.   Bank statements show that the above-referenced wire transfers from the Overseas Investment Funds, beginning on or about March 21, 2013, were the first credits to the Tanore Account.

120.   On or about March 21, 2013, Devonshire transferred an additional $430 million in 1MDB funds to the Granton Account.  Account opening documents for the Granton Account were signed by TAN.  The $430 million wire from Devonshire was

processed through a U.S. correspondent bank account at J.P. Morgan Chase, and bank statements show that it was the first credit to the Granton Account.

121.   On or about that same day, March 21, 2013, Granton transferred $430 million – the same amount received from Devonshire – to the Tanore Account.  As set forth above, the Tanore Account and the Granton Account have the same beneficial owner of record (TAN).

122.   Approximately four days later, on or about March 25, 2013, Tanore transferred $378 million back to the Granton Account.

123.   The passage of funds back and forth through accounts held in the name of different legal entities but having the same stated beneficial owner had no legitimate commercial purpose but was instead undertaken as a means of layering these transactions to obscure the nature, source, location, ownership and/or control of the funds.

124.   The transfer of 1MDB funds through the Overseas Investment Funds to the Tanore and Granton Accounts could not have been accomplished without the participation or acquiescence of one or more officials at 1MDB.

125.   Though they had no official position with 1MDB, LOW and TAN were also involved in arranging the transfer of funds from 1MDB to Tanore, using the Overseas Investment Funds as pass-through accounts.  HUSSEINY was also involved in the financial transactions into and out of the Tanore Account, in his capacity as Falcon Bank's Chairman.  Among other things, he worked to convince compliance officials at the bank that the transactions were legitimate.

> 2.   *The Diversion of Bond Proceeds Was Planned in Advance of the Bond Offering*

126.   The plan to divert bond proceeds to the Tanore Account via the Overseas Investment Funds pre-dated the March 19, 2013 bond offering.  For example, SINGAPORE BANKER 1, who served as the relationship manager for the 1MDB Global Account, emailed other bankers at BSI Bank in Singapore on or about February

24, 2013, with the subject "Aabar-1mdb update." The email indicates that the 1MDB-Aabar joint venture was to be capitalized with $6 billion and that, of this, "USD2 billion is expected to be invested in 4 structured funds." These funds included Enterprise, Cistenique, and Devonshire (i.e., the Overseas Investment Funds).

127.   In a subsequent email dated March 11, 2013, with the subject "Abu Dhabi Malaysia govt joint venture update," SINGAPORE BANKER 1 indicated that the "Abu Dhabi side is taking a little longer than anticipated" to arrange for its share of the funding for the ADMIC joint venture. SINGAPORE BANKER 1 further indicated that "[w]hile awaiting for the Abu Dhabi side to get organised, 1MDB is expected to invest usd 1 billion into structured funds."

128.   Prior to the bond issuance, 1MDB officials and LOW had not only arranged to "invest" bond proceeds in the Overseas Investment Funds, contrary to the uses of proceeds identified in the offering circular; they had also chosen Tanore and Granton as the ultimate recipients of the money. BSI Bank specifically marketed the Overseas Investment Funds to LOW and 1MDB as pass-through entities, designed to allow the client (*e.g.*, 1MDB) to funnel money to a third-party of the client's choosing (*e.g.*, Tanore). Documentation was drawn up in advance by bankers at BSI to effectuate the two-step movement of funds.

129.   Bank records associated with Devonshire's account at BSI Bank in Switzerland confirm that 1MDB's "investment" in Devonshire was intended, from the outset, as a means to transmit money to Tanore. Account opening records indicate that Devonshire opened an account at BSI Lugano on or about March 18, 2013 for the specific purpose of collecting funds beneficially owned by 1MDB and transmitting those funds to a third-party holding company identified by 1MDB officials. According to an internal bank memorandum describing the anticipated pass-through transactions, the "target investment holding [company] . . . will be controlled and owned by [1MDB Global's] trusted investment nominee – Mr Tan Kim Loong." The bank understood that

the transactions were structured in this layered fashion to allow 1MDB Global "to dissociate it[self] from the assets by using fiduciary fund structures."

        3.    *The Funds Transferred to Tanore Were Not Used for the Benefit of 1MDB or ADMIC*

130.    Bank statements for the Tanore Account demonstrate that funds transferred to the Tanore Account were not thereafter transferred to an account belonging to ADMIC or used for investment purposes with any apparent legitimate business connection to ADMIC or 1MDB.

131.    Instead, funds from the Tanore Account were sent to an account belonging to MALAYSIAN OFFICIAL 1, and were also used by TAN and LOW to purchase art. Funds from the Tanore Account were also used by LOW to acquire a substantial interest in a luxury hotel in New York City. These uses were inconsistent with the intended purpose of the bond proceeds as set forth in the offering circular and the April 23, 2013, 1MDB press release.

132.    TAN and LOW provided Falcon Bank with a number of fraudulent documents, including loan and investment agreements, intended to justify the sizeable transfers of funds into and out of the Tanore and Granton Accounts in the days and weeks following the 2013 bond sale. The documentation was sufficiently suspicious to trigger concern among Falcon Bank officials.

133.    On or about March 25, 2013, the Bank Manager of Falcon Bank in Singapore ("Falcon Bank Manager") called the CEO of Falcon Bank ("Falcon Bank CEO") to discuss the recent transactions into and out of the Tanore and Granton Accounts. According to a recorded conversation, the Falcon Bank CEO conferenced in HUSSEINY to the conversation and then proceeded to say, in relevant part:

> Mohammed, the rest of the documentation, which our friend in Malaysia has delivered is absolutely ridiculous, between you and me. . . .This is . . . gonna get everybody in trouble. This is done not professionally, unprepared, amateurish at best. The documentation they're sending me is a joke, between

you and me, Mohammed, it's a joke!  This is something, how can you send hundreds of millions of dollars with documentation, you know, nine million here, twenty million there, no signatures on the bill, it's kind of cut and paste. . . . I mean it's ridiculous!  . . . You're now talking to Jho [LOW], and tell him, look, you either, within the next, you know, six hours produce documentation, which my compliance people can live with, or we have a huge problem.

134.   Soon thereafter, in another recorded conversation, the Falcon Bank CEO called LOW and told him, in relevant part, as follows:

The documentation which we have received, Jho, it's a joke. It is not good and it, it, if you look at all that stuff. . . . I looked at it, I mean with, with, with the best of, of whatever we want to see and with all that Eric and we can do, but let, you know, my compliance guys and even my general counsel, he said, look, I mean, if an outside person looks at that and . . . we have in particularly hired an outside consultant law firm to look at it from the perspective, if, if anybody just looks at it remotely, this is going to be all over the place. Receiving banks, wiring, and, and, what I try to do here is protect Eric and anybody in the room because if, if any other bank just make "peep!" and this gets reported, . . . we are gonna have a huge problem. . . .

135.   Falcon Bank nevertheless processed the transfers into and out of the Tanore Account, apparently in part because HUSSEINY vouched for the legitimacy of the transactions.

136.   TAN closed the Tanore and Granton accounts in mid-December 2013.

137.   ADMIC, which was the stated basis for the 2013 bond sale, was ultimately never funded.

138.   As set forth in Section IV. below, part of the purchase funds for the NYC CONDO are traceable to funds diverted through this phase of the criminal scheme.

1

2

3

**IV.    THE DEFENDANT ASSETS WERE INVOLVED IN AND/OR TRACEABLE TO THE PROCEEDS OF THE FOREGOING CRIMINAL CONDUCT**

4

5

6

7

139.    As set forth below, the DEFENDANT ASSETS represent property derived from proceeds of the foregoing criminal conduct, as well as property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 or property traceable to such violations.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

140.    Between approximately February 2014 and June 2017, over $1.4 million in funds traceable to the misappropriated proceeds of the 2012 "Project Maximus" bond sale and the 2013 "Project Catalyze" bond sale (as discussed above in Sections II and III, respectively) were used by C. TAN to acquire the NYC CONDO.  As set forth below, approximately $3.346 million in bond proceeds were transferred through numerous accounts before being deposited into a LOW-controlled account held in the name of TKIL Global Investments Limited (the "TKIL Investments Account") at DBS Bank Limited ("DBS Bank") in Singapore.  The TKIL Investments Account further transferred approximately $1.58 million of these funds to accounts held in the name of C. TAN's mother, Lim Ngook Yim ("Lim"), and approximately $1.4 million of these funds were used to partially pay for the NYC CONDO.  As mentioned above, C. TAN was a close associate of LOW's from approximately 2009 through at least 2015.  In this capacity, C. TAN provided concierge services to LOW including arranging his travel and organizing his calendar.  C. TAN also traveled with LOW and other co-conspirators on numerous occasions.

23

*1.  The 1MDB Energy Langat Payments*

24

25

26

141.    As discussed above, on or about October 19, 2012, a total of approximately $790.3 million in 1MDB funds, representing the proceeds of the Project Maximus bond sale, was fraudulently transferred to the Aabar-BVI Swiss Account.

27

28

142.    On or about September 10, 2013, the Aabar-BVI Swiss Account transferred approximately $25.5 million of these funds to a DBS Bank account held in the name of

Affinity Equity International Partners Limited (the "Affinity Equity Account"). The Affinity Equity Account was nominally held by TAN as a proxy for LOW and was used to funnel misappropriated 1MDB funds to LOW and his co-conspirators.

143.    On or about September 18, 2013, the Affinity Equity Account transferred approximately $1.121 million of the funds from the Aabar-BVI Swiss Account to the TKIL Investments Account.

### 2. The 1MDB Global Investments Payments

144.    As discussed above, beginning in approximately March 2013, LOW and his co-conspirators misappropriated more than $1.26 billion in 1MDB funds that were raised through the Project Catalyze bond sale.

145.    On or about June 18, 2013, approximately $75.8 million of the Project Catalyze bond sale proceeds were wired from 1MDB Global (described above) to an overseas investment fund in the name of Pacific Harbor Global Growth Fund Ltd. ("Pacific Harbor").

146.    On or about June 20, 2013, Pacific Harbor transferred approximately $75 million of these funds to the Affinity Equity Account.

147.    On or about September 4, 2013, the Affinity Equity Account transferred approximately $350,000 of these funds to the TKIL Investments Account.

### 3. The Payments from the LOW BSI Account

148.    As discussed above, on or about March 21 and 22, 2013, approximately $835,000,000 in funds raised by 1MDB through the Project Catalyze bond issue was transferred to the Tanore Account at Falcon Bank in Singapore, after being routed through one of three Overseas Investment Funds.

149.    On or about March 25, 2013, a wire of approximately $378,000,000 was sent from the Tanore Account to the Granton Account at Falcon Bank in Singapore.

150.    On or about the same day the Granton Account received $378,000,000 from Tanore (that is, March 25, 2013), Granton wired $378,000,000 to an account at RBS Coutts in Switzerland held in the name of Dragon Market Limited ("Dragon Market").

LOW is the beneficial owner of this account. Bank records show that HUSSEINY, who was the Chairman of Falcon Bank, falsely represented to compliance officers at the bank that this transfer was made pursuant to a loan agreement with Aabar related to Aabar's development of the One 57 condominiums in New York.

151. In early November 2013, two additional wires were sent from the Granton Account to the RBS Coutts account belonging to Dragon Market ("Dragon Market Account"). All three wires were processed through a U.S. correspondent bank account at J.P. Morgan Chase. The approximate dates and amounts of these wires, totaling $518,500,000, are summarized below:

**Table 3: Relevant Wire Transfers from Granton to Dragon Dynasty**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 3/25/2013 | Granton | Dragon Market | $378,000,000 |
| 11/05/2013 | Granton | Dragon Market | $93,300,000 |
| 11/06/2013 | Granton | Dragon Market | $47,200,000 |

152. Between on or about April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account at RBS Coutts to an account at BSI Bank in Singapore held in the name of Dragon Dynasty Limited ("Dragon Dynasty"). These four wires were processed through a U.S. correspondent bank account at J.P. Morgan Chase. The approximate dates and amounts of these wires are summarized below:

**Table 4: Relevant Wire Transfers from Dragon Market to Dragon Dynasty**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 4/25/2013 | Dragon Market | Dragon Dynasty | $98,000,000 |
| 7/5/2013 | Dragon Market | Dragon Dynasty | $120,000,000 |
| 9/10/2013 | Dragon Market | Dragon Dynasty | $9,800,000 |
| 11/8/2013 | Dragon Market | Dragon Dynasty | $248,500,000 |

153.   Account opening documents for the BSI Bank account maintained by Dragon Dynasty ("Dragon Dynasty Account") list LOW as the authorized signatory on the account.  Those documents also list Dragon Market as the director of Dragon Dynasty.

154.   On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to an account at BSI Bank in Singapore held in the name of Low Hock Peng, a/k/a Larry Low, who is LOW's father (the "LHP Account").  On or about the same day that LOW's father received $248,500,000 from Dragon Dynasty, $235,500,000 was wired from the LHP Account to another BSI account in LOW's name (the "LOW BSI Account").  The wire details for that transfer read: "Gift from Low Hock Peng to Low Taek Jho."

155.   LOW ultimately transferred approximately $1.9 million of the funds in the LOW BSI Account to the TKIL Investments Account, as follows:

a.   On or about February 5, 2014, LOW transferred approximately $45.1 million of the funds in the LOW BSI Account to another BSI account under his control, held in the name of Alpha Synergy Limited (the "Alpha Synergy Account").  On or about the following day, the Alpha Synergy Account transferred approximately $40 million to the Affinity Equity Account.  On or about February 10, 2014, the Affinity Equity Account transferred approximately $675,000 to the TKIL Investments Account.

b.   On or about May 8, 2014, LOW transferred approximately $8.3 million of the funds in the LOW BSI Account to the Alpha Synergy Account.  On or about the following day, the Alpha Synergy Account transferred approximately the same amount to the Affinity Equity Account.  On or about May 20, 2014, the Affinity Equity Account transferred approximately $1.2 million of these funds to the TKIL Investments Account.

4.  *Payments from the TKIL Investments Account to Lim's Accounts Were Used to Purchase the NYC CONDO for C. TAN*

156.    As discussed above, between approximately September 2013 and May 2014, funds traceable to diverted Project Maximus and Project Catalyze bond sales were deposited into the TKIL Investments Account.  A portion of these funds was ultimately used to purchase the NYC CONDO for C. TAN, routed through bank accounts in C. TAN's mother's name.

157.    Bank records show that between approximately September 2013 and June 2014, the TKIL Investments Account transferred approximately $1.58 million of these funds to an account held by C. TAN's mother, Lim, at Citibank in Singapore (the "Lim Citi Account").  On or about February 20, 2014, the Lim Citi Account sent approximately $550,000 of these funds to an account held by U.S. law firm Kramer Levin as a partial down payment on the NYC CONDO.

158.    On or about November 14, 2014, the Lim Citi Account sent approximately $885,188 of additional funds traceable to the diverted 2012 (Maximus) and 2013 (Catalyze) bond proceeeds to another account held in Lim's name at ABN AMRO, a Dutch bank (the "Lim ABN -AMRO Account").  On or about June 1, 2016, the Lim ABN -AMRO Account further sent these, and other funds totaling approximately $2.7 million, to a third account held in Lim's name at China CITIC Bank in Hong Kong (the "Lim Citic Account").

159.    On or about June 14, 2017, the Lim Citic Account sent approximately $4.65 million to a U.S.-based attorney trust account as a final payment on the NYC CONDO. The $4.65 million payment is composed of approximately $3.6 million received from the Lim ABN AMRO Account and additional monies, sent on or about May 31, 2017, to the Lim Citic Account from a Hong Kong bank account held in the name of Bigwell Management Ltd ("Bigwell").  Internal bank correspondence from China CITIC Bank shows that Lim told the bank that the funds from Bigwell came from her son's (D. Tan) company.  However, bank officials also stated that there was "no record found on the business nature of the company."  China CITIC Bank ultimately closed the Lim Citic

Account because the account activities "were not matched with customer background and customer was unable to provide the source of funds & source of wealth."

160.    A U.S. visa application submitted by Lim, dated March 6, 2013, stated that she worked in "culinary/food services" and her employer was "M[c]Donald's" in Singapore.  Another U.S. visa application submitted by Lim, dated December 12, 2013, stated that at that time, Lim was retired.  In a separate immigration record, dated December 5, 2016, D. Tan listed his employment as a "sales associate" at Image Maker IT Supplies PTE LTD ("Image Maker") in Singapore.  Open-source records indicate that Image Maker is a vendor for business office supplies and stationery.

161.    The closing statement for the NYC CONDO, dated June 15, 2017, indicates that title to the NYC CONDO was transferred that day to buyer 10MSW2G, LLC, a New York entity.   The original purchase agreement for the NYC CONDO, executed in August 2013, lists C. TAN as 10MSW2G's "manager."

162.    The charts attached hereto as Addendum A visually depict the flow of funds to purchase the NYC CONDO.

    5.  *C. TAN Transferred Rental Proceeds from the NYC CONDO Into Other Accounts Under Her Control*

163.    Property and bank records show that, beginning in or around February 2018, C. TAN began receiving monthly rent payments for the NYC CONDO into her personal account at J.P. Morgan Chase Bank in the United States (the "TAN JPMC ACCOUNT").  From approximately February 2018 to January 2025, C. TAN deposited approximately $1.546 million in rental proceeds into the TAN JPMC ACCOUNT.  An analysis of the TAN JPMC ACCOUNT from its opening to the present shows that it was exclusively funded with rental proceeds from the NYC CONDO.

164.    Between 2021 and 2024, C. TAN paid approximately $488,452 from the TAN JPMC ACCOUNT to the New York City Department of Finance in property taxes and arrears for the NYC CONDO.

165.    Additional bank records show that, beginning in or around October 2020, C. TAN began transferring rental proceeds from the TAN JPMC ACCOUNT to a high-yield investor savings account held in her former married name, "Catherine DeNitto", at Charles Schwab Bank (the "SCHWAB ACCOUNT '8106").  The total amount transferred from the TAN JPMC ACCOUNT to the SCHWAB ACCOUNT '8106 between October 2020 to March 2025 that is traceable to rental proceeds from the NYC CONDO is approximately $390,000.

166.    In or around March 2025, C. TAN further transferred approximately $350,000 from the SCHWAB ACCOUNT '8106 traceable to proceeds from the NYC CONDO to another account at Charles Schwab Bank in her name, "Mayling Catherine Tan," (the "SCHWAB ACCOUNT '1384").  Bank records show that, between November 2020 and August 2022, the SCHWAB ACCOUNT '1384 received additional deposits from the TAN JPMC Account traceable to rental proceeds from the NYC Condo, totaling $125,026.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

167.    Paragraphs 1 through 166 above are incorporated by reference as if fully set forth herein.

168.    The DEFENDANT ASSETS are property that constitutes, and is derived from, proceeds traceable to one or more violations of: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.

169.   The DEFENDANT ASSETS are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

170.   Paragraphs 1 through 166 above are incorporated by reference as if fully set forth herein.

171.   The DEFENDANT ASSETS are traceable to property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h).  Specifically, the DEFENDANT ASSETS were involved in and are traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

172.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

173.   Paragraphs 1 through 166 above are incorporated by reference as if fully set forth herein.

174.   The DEFENDANT ASSETS re traceable to property involved in one or more transactions, or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h).

Specifically, the DEFENDANT ASSETS were involved in and are traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

175.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

177.   Paragraphs 1 through 166 above are incorporated by reference as if fully set forth herein.

178.   The DEFENDANT ASSETS were involved in, and are traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(B) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the DEFENDANT ASSETS were involved in and are traceable to funds that were and were attempted to be, transported, transmitted, or transferred, and a conspiracy to transport, transmit, or transfer, to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities,

45

that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315).

179.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)    due process issue to enforce the forfeiture of the DEFENDANT ASSETS;

(b)    due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)    this Court decree forfeiture of the DEFENDANT ASSETS to the United States of America for disposition according to law; and

(d)    for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: January 16, 2026

Respectfully submitted,

MARGARET A. MOESER
Chief, Money Laundering, Narcotics
And Forfeiture Section
Criminal Division
U.S. Department of Justice


     /s/ *Barbara Y. Levy*
JONATHAN BAUM
BARBARA Y. LEVY
JOSHUA L. SOHN (CBN: 250105)
Trial Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

46

# **<u>ADDENDUM A</u>**

# Purchase of Defendant NYC CONDO
## _Upstream Payments to TKIL and Lim_



# Purchase of Defendant NYC CONDO
## *Deposits*



# Purchase of Defendant NYC CONDO
## _Final Payment_



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **VERIFICATION**

I, Ryan Collins, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the factual allegations contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of January, 2026, at New York, NY.

Ryan D. Collins
Special Agent
Federal Bureau of Investigation